UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 22-231** |
| **v.** | * | **SECTION: "A"** |
| **GEORGE PETERSON** | * | |
| | * * * | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Peterson's Motion to Dismiss the Indictment (Rec. Doc. 42) on the grounds that the National Firearms Act's (NFA) registration requirement for silencers violates the Second Amendment is notable for what it does *not* say. Every single federal court to consider a constitutional challenge to the NFA's silencer registration requirement has rejected it:

- *United States v. Cooperman*, 2023 WL 4762710, at *1 (N.D. Ill. July 26, 2023)
- *Cox v. United States*, 2023 WL 4203261, at *6–7 (D. Alaska June 27, 2023)
- *United States v. Villalobos*, 2023 WL 3044770, at *11-12 (D. Idaho Apr. 21, 2023)
- *United States v. Saleem*, __F. Supp.3d__, 2023 WL 2334417, at *8-11 (W.D.N.C. Mar. 2, 2023)
- *United States v. Royce,* 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023)
- *United States v. Beaty*, Case No. 6:22-cr-95-PGB-DCI, at 19-21 (M.D. Fla. Jan. 20, 2023)
- *United States v. Serrano*, __F. Supp.3d__, 2023 WL 2297447, at *13-14 (S.D. Cal. Jan. 17, 2023)
- *United States v. Bolatete,* 977 F.3d 1022, 1036 (11th Cir. 2020)
- *Kaszycki v. United States*, 2020 WL 2838598, at *4 (W.D. Wash. June 1, 2020)
- *United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020)
- *United States v. Hasson*, 2019 WL 4573424, at *4-5 (D. Md. Sept. 20, 2019), *aff'd* 26 F.4th 610 (4th Cir. 2022)
- *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018)
- *United States v. Stepp-Zafft*, 733 F. App'x 327, 329- 330 (8th Cir. 2018)
- *United States v. Grey*, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018)
- *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009)
- *United States v. Garnett*, 2008 WL 2796098, at *4 (E.D. Mich. 2008)
- *United States v. Perkins*, 2008 WL 4372821, at *4 (D. Neb. 2008)[1]

---

[1] Likewise, although not deciding a challenge to the regulation of silencers, two recent decisions have cited the silencer case law with approval. *Miller v. Garland*, __F. Supp.3d__, 2023 WL

These courts have rejected the exact arguments (indeed, nearly word-for-word) Peterson makes here and this Court should do the same.[2]

## ARGUMENT

As courts around the country have held, both before and after *Bruen*, firearm silencers are not "arms" within the meaning of the Second Amendment. But even if they were, they would be "dangerous or unusual weapons" outside the scope of Second Amendment protection. Moreover, even assuming that silencers are protected by the Second Amendment, the NFA's registration requirement would not "infringe" on that constitutional right. Further still, the registration requirement is analogous to historical regulations on firearms sales and thus, in any event, would be constitutional under *Bruen*.

**I.    The NFA's Registration Requirement Does Not Violate the Second Amendment**

**A.  Silencers are not "arms" within the meaning of the Second Amendment.**

The Second Amendment applies to "bearable arms." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). That is, "weapons of offence, or armour of defence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."

---

3692841, at *10 (E.D. Va. May 26, 2023) (analogizing stabilizing brace to a silencer and explaining that "courts have routinely held that a silencer is not a firearm because a silencer cannot cause harm on its own, it is not useful independent of its attachment to a firearm, and a firearm remains an effective weapon without a silencer") (internal quotation marks omitted) (citing cases); *Ocean State Tactical, LLC v. Rhode Island*, __F.Supp.3d__, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022) (analogizing large capacity magazines to silencers and citing cases holding that a silencer is not a weapon within the scope of the Second Amendment).

[2] For example, taking just one recent decision, in *Cox v. United States*, the defendant argued that a silencer is protected by the Second Amendment because: a bullet must pass through it (Peterson Mot. 5); it can reduce sound pressure levels below 140 decibels (Peterson Mot. 7); and it can improve firearm owners' ability to practice self-defense by reducing recoil and muzzle rise (Peterson Mot. 9). *Cox v. United States*, Case No. 19-cr-40 (D. Alaska), Rec. Doc. No. 91 (Def's Motion to Dismiss).

*Id.* (internal quotation marks, alterations, and citations omitted). Silencers are not protected by the Second Amendment for the simple reason that they are not "arms." Rather, a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also, e.g.*, *United States v. Cooperman*, 2023 WL 4762710, at *1 (N.D. Ill. July 26, 2023) ("as a firearm accessory, silencers are not weapons and therefore cannot be 'bearable arms' protected by the Second Amendment"); *Cox v. United States,* 2023 WL 4203261, at *7 (D. Alaska June 27, 2023) (silencers are not "arms" because a "silencer serves no purpose without a firearm and it is not necessary for the functioning of the firearm"); *United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) (silencer is a "firearm accessory" and not "a weapon of offence or an armour of defence" because "it does not serve any intrinsic self-defense purpose," it "cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm") (internal quotation marks and alterations omitted); *United States v. Saleem*, __F. Supp.3d__, 2023 WL 2334417, at *8-11 (W.D.N.C. Mar. 2, 2023) (adopting *Hasson*'s reasoning).

Nor are silencers "implicitly" protected by the Second Amendment. Unlike ammunition or access to a firing range, a silencer is not necessary to use a firearm for its core purpose of self-defense. A silencer is self-evidently not required for a "gun to function as intended" and their regulation would not, and has not, rendered the right to bear arms "meaningless."[3] *See, e.g.*, *Hasson*, 2019 WL 4573424, at *5 (unlike the necessity of ammunition, "a firearm remains an

---

[3]*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) (magazines protected by Second Amendment because they feed ammunition into certain guns and "ammunition is necessary for such a gun to function as intended"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (ammunition protected by the Second Amendment because "without bullets, the right to bear arms would be meaningless").

effective weapon without a silencer of any type attached"); *Saleem*, 2023 WL 2334417, at *10 ("The use of a silencer is in no way necessary to the effective use of a firearm . . . a firearm can be used safely and effectively without a silencer.")[4]; *United States v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) ("A silencer is not necessary to make a firearm operable. Rather, a silencer is simply a means to reduce sound omitted from a firearm."); *see also Cooperman*, 2023 WL 4762710, at *1 (rejecting analogy to access to firing ranges because "silencers are sound suppressing firearm accessories and do not aid in acquiring or maintaining firearm proficiency").

In sum, silencers are not "bearable arms" within the scope of the Second Amendment. In the language of *Bruen*, Peterson's possession of an unregistered silencer is not protected because it is not covered by the "Second Amendment's plain text," and his motion to dismiss should therefore be denied. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).[5]

### B. Even if silencers are "arms," they are "dangerous or unusual weapons" not protected by the Second Amendment.

Not all "arms" receive Second Amendment protection. "[T]he right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*,

---

[4] As have other courts, *Saleem* rejected the exact argument Peterson makes here that silencers are protected by the Second Amendment because the CDC recommends their use at firing ranges. *Id.* at 10 & n.7. Like earmuffs and earplugs, a silencer may help reduce noise levels, but it simply is not necessary to make a firearm operable. Put differently, the lack of a registered silencer has not rendered the firearms of tens of millions of gun owners in this country useless.

[5] For the avoidance of doubt, *Bruen* did not expand *Heller*'s delineation of bearable arms to include firearm accessories. Rather, it reaffirmed *Heller*'s framework and holdings. *See Bruen*, 142 S. Ct. 2111, 2132 (2022) ("the Second amendment extends . . . to all instruments that constitute *bearable arms*") (quoting *Heller*, 554 U.S. at 582) (emphasis added); *see also id.* at 2157 (Alito, J. concurring) (*Bruen* does not "decide anything about the kinds of weapons that people may possess" and does not "disturb[] anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 (2010) . . . about restrictions that may be imposed on the possession or carrying of guns").

142 S.Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). Rather, it is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual' weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time." *Id.* Even if silencers were to qualify as "arms," the NFA's registration requirement is well in line with the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.*

Silencers have been recognized as dangerous since their creation. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 246-247 (2020) (available on Westlaw). The invention was patented in 1908 and "[o]bjections to civilian use of silencers appeared almost immediately." *Id.* at 246. States began banning them the following year and between "1909 and 1936, at least fifteen states enacted silencer restrictions." *Id.* at 248.

A principal concern about silencers was that "they would be used by criminals seeking to avoid detection." *Id.* at 247. For example, "Chicago police discovered as early as 1922 that the city's lawbreakers were ordering sales catalogs from the Maxim Silencer Company, and New York authorities reported similar criminal interest in silencers around the same time." *Id.* (internal quotation marks omitted). By 1930, the inventor of the silencer and his business, Maxim Silencer Company, "'discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime.'" *Id.* (quoting *Maxim Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27). This understanding of the danger posed by the possession of silencers was shared by Congress, which included them in the NFA, a statute enacted "to regulate certain weapons likely to be used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992); *see also id.* at 516-517 (citing legislative history that "clearly indicated congressional

5

intent [was] to cover under the National Firearms Act only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters").

Unlike handguns, which are "indisputably in 'common use' for self-defense today," *Bruen*, 142 S. Ct. at 2143, silencers are uncommon and unnecessary for self-defense.[6] Rather, silencers have been subject to regulation (including outright prohibition) since their invention and thus, even assuming they are "arms," they are "dangerous and unusual" and fall outside the scope of the Second Amendment. *See, e.g.*, *United States v. Beaty*, Case No. 6:22-cr-95-PGB-DCI at 20 (M.D. Fla. Jan. 20, 2023) ("[E]ven if a silencer qualifies as a firearm—which it doesn't—prohibitions against carrying dangerous and unusual weapons survive the Second Amendment, and a silencer is an unusual weapon."); *Saleem,* 2023 WL 2334417, at *10 ("silencers fall into the category of 'dangerous and unusual weapons' and are outside the scope of the Second Amendment's protection"); *United States v. Grey*, 2018 WL 4403979, at *13 (C.D. Cal. Sept. 13, 2018), *aff'd sub nom. United States v. Grey*, 959 F.3d 1166 (9th Cir. 2020) ("[T]he Second Amendment does not extend to 'dangerous and unusual weapons' such as silencers.") (citing *United States v. McCartney*, 357 Fed. App'x 73, 76 (9th Cir. 2009)); *see also Cox*, 906 F.3d at 1186 n.13 ("Though we needn't decide the issue, we note that the government cites authority concluding that silencers are dangerous and unusual, the type of 'arm' traditionally excluded from the Second Amendment's protection.").

---

[6] Peterson claims that silencers are in common use because there were 1,489,791 registered in 2018. Peterson Mot. 12-13. "In 2017, there were an estimated 393.3 million civilian-held firearms in the United States." *Bruen*, 142 S. Ct. at 2164 (Breyer, J., dissenting) (citation omitted). Assuming that each silencer is attached to one firearm, less than half of one percent of guns in the United States are equipped with a registered silencer.

6

### C.  The NFA's registration requirement does not "infringe" on the right to bear arms.

Silencers are not "arms" protected by the Second Amendment. But even if they were, the NFA's registration requirement would not "infringe" on the right to keep and bear those arms.

*Heller* and *Bruen* establish that the government cannot *prohibit*—whether by outright ban or "open-ended discretion" in licensing—the possession and carrying of handguns for self-defense. But *Bruen* expressly did not disturb the "shall issue" licensing requirements of 43 states because those laws "do not require applicants to show an atypical need for armed self-defense." *Bruen*, 142 S. Ct. at 2138 n.9. Rather, the Court distinguished those laws, which may require a "background check" and "firearms safety course," because they are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" and "appear to contain only narrow, objective, and definite standards guiding licensing officials." *Id.* (internal quotation marks omitted). In his concurrence, joined by Chief Justice Roberts, Justice Kavanaugh emphasized that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162.

To legally possess a silencer, the NFA requires only that an individual submit fingerprints and a photograph, pass a background check, and pay a $200 tax. *See* 26 U.S.C. §§ 5811, 5812. This registration requirement is far less burdensome than the requirements approved in *Bruen*. And it is exactly the type of "objective and definite" standard approved in *Bruen* to ensure that those possessing firearms are "in fact, law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9.

Peterson does not even attempt to distinguish the minimal silencer registration requirement from the more onerous "shall-issue" requirements approved in *Bruen*.[7] Instead, he argues that that the NFA "burdens" the alleged right to possesses a silencer because of the average wait time to process a registration application. *See* Peterson Mot. 16-18. But Peterson proclaims that he is making an as-applied challenge to the NFA's registration requirement. *Id.* at 24 ("But that fact is irrelevant to considering Mr. Peterson's as-applied challenge to the silencer-registration requirement."). He is charged with possession of an *unregistered* silencer. He does not assert that he attempted to register his silencer or was otherwise deterred by average processing periods. *See Cox*, 2023 WL 4203261, at *8 (D. Alaska June 27, 2023) (holding that possession of a silencer is not protected by Second Amendment and rejecting argument that NFA registration processing times violate Second Amendment: "Although Mr. Cox discusses an alleged length of time it takes to register weapons in compliance with federal law and maintains that time amounts to an unconstitutional burden, he does not point to any evidence that he attempted to register the weapons.").

Accordingly, even assuming silencers are protected by the Second Amendment, the NFA's registration requirement is precisely the type approved in *Bruen* and does not infringe on the right to bear arms. *See Beaty*, Case No. 6:22-cr-95-PGB-DCI at 21 ("[T]he NFA's registration and taxation requirements, which apply to the silencer the Defendant possessed, do not infringe on the right to keep and bear arms.")

---

[7] In fact, Peterson's Motion does not mention *Bruen* at all. His case law, statistics, and secondary sources all end in 2019. His arguments about means-end scrutiny, *see* Peterson Mot. 18-25, are, accordingly, legally irrelevant. To the extent that Peterson now wishes to rely on *Bruen*, he is foreclosed from doing so. *See, e.g.*, *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").

### D. The NFA's registration requirement is readily analogous to historical regulation of commerce in firearms.

The identification of a historical analogue to the NFA is wholly unnecessary given that silencers fall well outside the protections of the Second Amendment and the NFA's registration requirement is less burdensome than other regulations which do not infringe on the Second Amendment right to bear "arms." However, historical analogues to the NFA's registration scheme are available.

"[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017) (available on Westlaw). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* "In response to the threat posed by Indian tribes, the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Teixeira*, 873 F.3d at 685. In the early 17th century, Connecticut banned residents from selling firearms outside the colony; Virginia likewise provided that its residents could sell arms and ammunition only to residents of the colony. *Id.* at 685 & n.18. And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. Spitzer, *Gun Law History in the United States*, 80 Law & Contemp. Probs. at 74. And throughout the 1800s states imposed taxes on gun ownership: Rhode Island in 1851, North Carolina in 1856, Georgia in 1866, Mississippi in 1867, Louisiana in 1870, and Florida in 1898. *See id.* at 76-77.

9

Like these early laws, the NFA's registration requirement (including the one-time $200 tax) does not categorically prohibit the possession of silencers. It merely imposes a record-keeping requirement to trace the transfer of silencers and ensure that they do not fall into the hands of dangerous individuals. Although the NFA is not identical to these historical statutes, the government need only identify a "historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. Here, the colonial regulation of commerce in firearms—in particular, the recording of firearms and certain transfer restrictions—provides a sufficient historical analog. *See, e.g.*, *United States v. Serrano*, __F. Supp.3d__ 2023 WL 2297447, at *12-14 (S.D. Cal. Jan. 17, 2023) (silencers do not fall within scope of Second Amendment but, even if they did, the NFA's registration requirement is justified by the historical analogues cited above); *Villalobos*, 2023 WL 3044770, at *13 (D. Idaho Apr. 21, 2023) (silencers do not fall within scope of Second amendment but, even if they did, the "the regulation of silencers is readily analogous to the Nation's history of imposing commercial regulations on firearms"); *Saleem,* 2023 WL 2334417, at *11 n.9 (holding that silencers do not fall within the scope of the Second Amendment and stating that, "[w]hile the Court does not reach the historical inquiry here, the Court notes that based on the record, it appears the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *Beaty*, Case No. 6:22-cr-95-PGB-DCI at 21 n.11 ("The NFA's record-keeping and attendant payment requirements are consistent with our Nation's historical regulation of firearms.") .

## II.     Peterson is Not Entitled to an Evidentiary Hearing

Peterson requests an evidentiary hearing to present unspecified testimony from unspecified witnesses "knowledgeable in the use and registration of firearms." Peterson Mot. at 29. But he has not identified any factual dispute warranting such a hearing. *Cf. United States v. Harrelson*, 705

10

F.2d 733, 737 (5th Cir. 1983) ("Evidentiary hearings are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief.").

There is no dispute as to what is required to register a silencer under the NFA. And Peterson's lone factual assertions with respect to the capabilities of a silencer are that a bullet passes through it when it is attached to a firearm, it can reduce sound pressure levels, and it can improve accuracy. Peterson Mot. 5, 7, and 9. For the reasons discussed above, accepting these factual assertions as true would not justify relief. Indeed, the exact arguments Peterson makes—albeit, largely under the wrong legal framework—have been rejected by federal courts numerous times over.

Because Peterson has not identified any evidence he could elicit that would have any bearing on his Motion, his request for an evidentiary hearing should be denied.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the Indictment should be denied.[8]

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY

/s/ David Berman
DAVID BERMAN
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3052

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ David Berman
DAVID BERMAN
Assistant United States Attorney

---

[8] In two pages at the end of his Motion, Peterson, applying a pre-*Bruen* obsolete legal standard, asserts that a "serialization requirement" is unconstitutional. Peterson Mot. 26-28. The Court need not reach this issue because Peterson is not charged with possessing a firearm with a removed serial number. In any event, numerous courts post-*Bruen* have held that 18 U.S.C. § 922(k), possession of a firearm with an obliterated/removed serial number, is constitutional for many of the same reasons as the NFA's registration requirement. *See, e.g.*, *Serrano*, __ F. Supp.3d __ 2023 WL 2297447, at *13 (The serial number requirement embodied in § 922(k) and the registration requirement embodied in 26 U.S.C. §§ 5861(d) and 5871 are "two sides of the same coin" and "constitutional for the same reasons."); *United States v. Avila*, No. 2023 WL 3305934, at *5 (D. Colo. May 8, 2023) ("Like numerous other courts around the country have held post-*Bruen*, the Court concludes that § 922(k) does not implicate the Second Amendment.") (citing cases).